I'm sorry, 05-5175, Frazier versus the United States. Counsel, I just want to make sure, how do you prefer to have your name pronounced? Is it Raegor? Raegor. Raegor, okay. Well, Mr. Raegor, that is what it will be. Step on up whenever you're ready. You've reserved five minutes for rebuttal, correct? Yes, Mr. Raegor. Good afternoon. May it please the court, my name is Dale Raegor, attorney on behalf of the appellants Bill and Kathy Frazier. I thank you for the opportunity of appearing before you today. Washington, D.C. is a long way from Montana, not only by way of distance but also in lots of other different ways. My clients firmly believe that they've been mistreated by the government and the government handling of this case and that the interpretation, their interpretation of the contract language and the representations that were given to them by government representatives and that the government should not be permitted to hide behind the terms of what we consider to be a poorly drafted lease agreement. If the government had decided to enter into a new contract with a different provisioner, say maybe Ray Clevenger and his wife, to run this yacht basin marina, and Ray Clevenger and his wife weren't interested in buying any of your improvements, you would have been in kind of a difficult position, wouldn't you? That's correct. You had no assurance at all that if you had built these improvements that you wouldn't have in essence just given them to the government. That's correct. But my client was willing to accept that requirement because as a practical matter, he was confident that because of the value of the improvements and a new concessioner would have to come in and build the same improvements, that they could work out some kind of a deal that would salvage the value of his investment. Right. But I mean the government could have perhaps, you know, charged more rent or whatever to the new provisioner on the grounds the new provisioner wasn't going to have to build any docks or anything. I mean you certainly weren't going to pick the stuff up and carry it away, right? Or the government could have made you do that, right? Yes. That was one of the provisions of the lease that required all of the improvements to be removed. Certainly if my client could not have sold the improvements to a new concessioner, then the likelihood is they would have lost considerable value. There would still be some salvage. You could have had grounds to really be angry if the government had put the contract out to McLevenger and his wife and then they had said to you remove all those things, go in here and take out all of your improvements. That would have been the ultimate. Yes. But I think the lease contemplated that my client would have the opportunity to sell those improvements to a new concessioner. And so the lease contemplated that fact. Your Honors, I recognize I have a burden. Bottom line, your theory is the government simply wasn't allowed to close the thing down. That's correct. They had an obligation either to make a new lease with you all or with somebody else, and in the middle of the time they simply weren't allowed to issue an announcement saying they were thinking about shutting the facility. That's correct. Your Honors, as far as the standard of review is concerned. What case, what theory do you have that says the government's got a food stamp program? The government decides it doesn't want to have a food stamp program anymore. Is it required to have a food stamp program? Well, your Honor, I would argue that under the terms of this agreement, the lease that they entered into, the contemplation was on the part of my client that they would be protected at the end of the lease term and be able to either have a renewal of the lease or to sell their improvements to another concessioner. Well, they got one. That's correct. The lease was renewed. It was renewed. So what's the beef? Well, what we're talking about is a claim for damages for the period of time from the announcement of the resource management plan, the RMP, in which the government announced that they would no longer have a yacht basin marina at that location. But didn't the, what doesn't, didn't the government, Mr. Ringer, doesn't in that sort of circumstance, there's no, there doesn't, there's no allegation here as far as I can tell that there was not that contemplation on the part of the government. And couldn't the government have been criticized if it had not announced what it was thinking about doing? So to give interested people a chance to come forward and express their views. I mean, what's, I mean, we often hear complaints about the government doing something in secret and not letting people know what it's going to do. Here the government said we're thinking of doing this. What, I mean, it seems to be the right course to follow. Well, Your Honor, I think by promulgating that resource management plan in which the preferred option was to eliminate this marina, it's our position that that constituted a repudiation of the contract and the provisions of the contract that required. But there's no assertion here, is there, and please correct me if I'm wrong, there's no assertion here, is there, that this was done in bad faith with an intent to injure your clients. In other words, there's no assertion here that there was some kind of grudge against your clients and that they were doing this as a little artifice, if you will, to hurt them and take away business in the short term, even though they eventually planned to renew the lease. Well, Your Honor, that does work into our argument of a breach of the covenant of good faith and fair dealing in this entire arrangement because we do submit that this proposal that they had to close the marina was arbitrary and capricious and it didn't have any reasonable basis for doing so. And subsequent events prove that to be correct. Yeah, but there's no assertion. I mean, often sometimes in a contract case we will hear the assertion, the allegation, and sometimes it's correct, sometimes it's not correct, that a government officer, to use a crude term, had it in for the contractor and went out of his or her way to create problems for the contractor. I mean, there's no kind of an allegation of that sort here, is there? Except to the extent that that kind of conduct goes to a breach of the good faith and fair dealing. The duty of good faith and fair dealing is you have to have good faith and fair dealing with respect to a contract term, to a provision in the contract. It kind of struck me that you were seeking to use the covenant of good faith and fair dealing in a kind of circular way to create a contract obligation here. Well, Your Honor, I do think... Of course, in a cart situation, I think, you have to have a contract provision. I think there is some language in cases, and I think the TECOM case is one that we've cited in the brief, where the court is focused on an attempt by the government to sabotage what was considered to be the benefit of the bargain on the part of the contracting party, to enjoy the fruits that were anticipated to be available to the contracting party with the government. But what that bargain was that if the contract was renewed and you got it, everybody's happy. If the contract was renewed and somebody else got it, you would not have to remove your things if the other person wanted to buy them, and you two could agree on a reasonable price. That's correct. And also that the government would go through a reasonable process of selecting a preferred option of closing the marina rather than doing it in an arbitrary and capricious way. I didn't understand that last part. Are you suggesting that it was an option within the scope of the contract to close the marina altogether, that that would not have been a breach of the contract? No, Your Honor. What was within the scope of the contract was the government's ability to periodically amend and review its resource management plans. But that amendment might involve, for example, closing the marina, right? That was not our consideration at all, Your Honor. Well, you didn't, right. But, you know, more basically, if I have a lease, I have a property and I lease it to renters from time to time. If I give them a five-year lease, unless I represent to the contrary and provide an option to them or whatnot, the assumption is that they're good for five years, but after that, we'll see. Now, my problem in this case is I'm finding the we'll see default position that is present whenever you have a lease for X period of time not to be countered by anything in this contract or anything that I can see in the record that says, but we will keep the place open. What do you point to as the contractual basis on which they reasonably relied for the proposition that that lease would be given, if not to them, then to someone, and that the marina would not be closed? Well, Your Honor, I'd like to refer to the terms of the lease agreement, and it's Article 2, paragraph capital B, subparagraph 1. And actually, it's in two places. It's in subparagraph 1 and subparagraph 2. What page are we on? It's on A15. Okay, fine. Thank you, sir. Thank you. Article 2? Article 2, capital B, 1, and paragraph 2, both. And the language is in the middle of those particular paragraphs, stating that reclamation will allow the concessioners to sell their improvements to a new concessioner, provided that the new concessioner agrees to such an arrangement and provided that both parties agree to an acceptable price. That's assuming there is a new concessioner. That's correct. But there isn't a representation. My question is really, is there any representation here that says this marina will not be closed for X period of time? This is, at best, it seems to me, a very indirect way of saying that we anticipate that the marina will remain open, regardless of whether you're the concessioner or not. I'm struggling to find something that rebutts the natural assumption when you have a lease that at the termination of that lease, the person who is the lessor has a right to do whatever he or she wants with the property, including stopping leasing it to anyone. Well, the second provision of the contract on which we believe creates an ambiguity is in paragraph Article 4, capital D, and it's on page A18. And that's the second sentence that recites upon expiration of the lease term, the lease may be reissued, renewed, to the existing concessioners for an additional 10 years, but only after reclamation has utilized the competitive bid process. The word may seems to me to be a red flag cutting the other way. Well, Your Honor, I don't think my client perhaps understood the fine distinction between shell and may. But I do think that that term may could refer to the following conditional sentence, that the only way that it would not have been awarded to my client was if they were not successful in the competitive bid process. Am I right that the event of breach of the contract that you assert on your client's behalf was the announcement by the government that it was considering cessation of the project, right? That's correct. That's the triggering element. Let's assume for purposes of argument that information came to the government, which at the time they received the information, they had every reason to believe was true, namely that the water was contaminated. And so they announced the proposed closing of the marina on the grounds that the water around it was contaminated. Would that have been an event of breach? I don't believe so, Your Honor. I think there is a provision that does allow the government to terminate the lease for causes consistent with the operations of the dam. In the contract? Yes, Your Honor. I think there's some language in there. Mr. Regative, though, to pick up on Judge Clevenger's question, supposing they had said there's increasing evidence of contamination and this lease will be completed, however, there will be no further leases. I mean, that's really the situation that would put it squarely in this context. Would you have a claim then? Well, Your Honor, I think that if the government was relying on a clause of the lease that allowed them to terminate for some environmental reasons. No, no, no, not terminate the lease, but not have a new lease. That's correct. Not renew the lease at the end of the lease term. Then we wouldn't have a claim because the government is acting in accordance with rights that were allowed under the terms of the lease agreement. But the government wasn't doing that. Well, no, there's no such expression in the lease of the right not to renew the lease in the event of the water being hazardous. That's just inherent in the government's authority, presumably. And I think there is some language in the lease that would support that. I was looking at the public health and safety termination of the lease issue, if that's what you're talking about. I think that is, Your Honor. Well, it says you can terminate the lease after the failure of the concessioner to do X, Y, and Z. Except for noncompliance that the reclamation determines to be a threat to public health and safety. That sort of contemplates some noncompliance by the concessioner that leads to a public health and safety problem. You know, like not cleaning up the trash cans and that sort of thing. I didn't see anything in the lease that contemplated somebody saying the water was contaminated. If you'd like, Your Honor, my time has expired. I can try and locate the provisions. The point I was trying to get at is that I think you probably would clearly agree that the government can shut down the concession if the water is unsafe. That's one interest that the sovereign is executing. If the sovereign decides that this is not an effective place for the government to be having a resort to have something, that's also a sovereign decision. I don't know why there would be any distinction between the two of them. In essence, I don't understand myself why the government's announcement, not alleged to be in bad faith, that it was considering closing the marina, why that is not a perfectly legitimate thing for the government to do. Well, Your Honor, I guess first of all, I think in response to your point, the government went farther than just say they were considering closing the marina. They said closing the marina was their preferred option in this resource plan. Well, the government, as you probably read in the paper, the government is constantly considering closing military bases and other institutions, and they issue proposed orders that get very, very close. In fact, they issue a closure order that's subject to presidential review. Anybody who's operating a business in that neighborhood living under a cloud, totally living under a cloud. But, Your Honor, in this particular case, we have an agreement with the government where they inserted certain provisions that we contend would be breached by that government conduct. Thank you. We'll restore your full five minutes of rebuttal, and we'll hear from the government. Thank you, Your Honor. Is it Ms. Connolly or Ms. Connealy? It's Ms. Connealy. Connealy, okay. Thank you. Ms. Connealy, you can start whenever you're ready. Thank you, Your Honor. May it please the court. This court should affirm the decision of the United States Court of Federal Claims dismissing the appellant's complaint. Now, in their reply brief, the Fraziers admit that the government had no obligation to renew their lease, and they also have admitted in their reply brief and today that any new concessioner would have no obligation to purchase their improvement. Instead, they now seem to claim that the government either had to renew their lease or find a new concessioner, and by not doing either, the government breached the lease. Now, there are two responses to this. First, the appellant's arguments are contrary to the plain language of the lease. Under the plain language of the lease, the government was given the option of renewing the lease, and if the government took that course and decided to renew the lease, it had to first utilize a competitive bid process. If the government chose not to renew the lease, it would not have had to take that course. Second, even if the lease obligated the government, as the Fraziers have alleged here, the government fulfilled that obligation, and the issue is now moved. When you say that the government had the option of deciding whether to renew the lease, you're referring to the language may? That's correct, Your Honor. I mean, there's no express statement anywhere in the agreement, I take it, that says one course the government may follow is not to renew the lease or release to anyone else. It's an implication of the word may, correct? Well, it's an interpretation of the language on page A18, which was just being discussed earlier. Right, the lease may be reissued, but only after a competitive bid process. Correct. All right. In this case, the government held the competitive bid process, and the lease was renewed to the Fraziers for 20 more years. Indeed, on page 2 of their reply brief, the Fraziers admit that, quote, either renewing the lease or leasing to a new concessionaire would satisfy the terms of the lease, and in this case, the government satisfied that requirement that they are alleging. But let's assume their theory of the case is that, in effect, there was a breach because it was an anticipatory repudiation that injured them. Let's assume all that is correct and that the issue comes down to whether you had an obligation to either renew the lease or to lease to some third party. That's their contention, and your answer is what? Our answer is that there was no such obligation under the plain terms of the lease agreement. Coming back to the language that you just focused on on A18? That's correct. Coming back to the language on A18, which gives the government the option of renewing the lease and only requires the government to have a competitive bid process if it decided to reissue or renew the lease. And just in response to the language that Mr. Rager had pointed out earlier on A15 under B1 and B2, that language also doesn't require the government to take the actions that the appellants are alleging. There, the language regarding allowing the Fraziers to sell their improvements to a new concessionaire, if you look at the plain language, that sentence starts out with however, and the sentence before that obligates the concessionaire, the Fraziers in this case, to remove all of their improvements to the concession site at the end of the term of their lease. Now, the only exception to that is the next sentence. However, the agency will allow the concessionaires to sell their improvements to a new concessionaire. So that language in its plain reading also does not obligate the government to either renew the lease or find a new concessionaire to purchase. You're saying the negative implication of that is that there might not be a new concessionaire. That's correct, Your Honor. Lastly, I just wanted to address the Fraziers' argument that there was an anticipatory breach of the lease. Even if the lease obligated the government to do as the Fraziers alleged, either renew the lease or find a new concessionaire, even if the lease had obligated that, the government's release of the initial draft of the concessionaire, was not an anticipatory breach of that lease. It was an initial draft subject to public comment and subject to change. And the appellants were well aware of this as they themselves submitted comments to the initial draft RMP explaining why the marina should not be closed. For these reasons, the decision of the United States Court of Federal Claims should be affirmed. Thank you. Thank you, Ms. Connealy. Mr. Rager, you have your full five minutes if you need it. Thank you, Your Honor. I probably won't take the full five minutes unless there are further questions. Perhaps the only comment that I have in rebuttal to the comments from the government are the issue of this draft RMP. And I'd like to kind of have the Court focus on the Fraziers' perspective when this draft RMP came out, saying that their Canyon Ferry Yacht Basin Marina was anticipated to be closed. They were in the process of a building program to create new docks that would generate more income from their operations.  Would they be able to convince the government to change their preferred option and continue their building program to generate more return? Or would they stop and wait until there was some resolution of the government's request for? It's a chronic problem for anybody who's in the last year or so of term lease, where the government has reserved itself the option of possibly renewing, right? You don't know whether to make the home improvements or not. Especially here because the way the contract is written, the price for selling the improvements is sort of dictated by the contract. Anybody who was a concessionaire that won other than your client would offer you a penny more than it costs to remove the things. You couldn't get more than a penny more than the cost of removing the improvements because you're obligated to remove them. I don't think that's correct, Your Honor, because I think a new concessionaire, knowing that if they didn't buy these improvements, they'd have to expend considerable resources to build their own, that there would be more of a... There's no incentive for a new concessionaire to pay you market value for the improvements. They'd pay you just a tiny more than it costs you to rip them out because you're obligated to rip them out. And they would be obligated to construct some new ones as well. So you'd be somewhere in between. Yeah, that's correct. You could say to them, drop dead, I'll take a loss on this if you're going to be so unkind. That's right. It would be a negotiation with a new concessionaire. But at least the client would have the opportunity to do that and would be denied that opportunity from the actions of the government. For these reasons, we believe there is ambiguity in the provisions of this contract, that it was a poorly drafted lease, and there are two susceptible, reasonable interpretations, and we believe that we would have the facts to support intrinsic evidence and interpreting the contract against the government to provide for an interpretation favorable to our clients. At this stage in the game, the only such evidence that I saw of record was a statement, I believe, by Mr. Fraser that it was his understanding that the concession would stay alive. And the representations of the representative of the government as well, this Tim Personius. And you have to understand when this lease was initially created, our clients were reluctant to even do this because the marina was condemned and it was going to take considerable money to put these improvements in place. And they wanted assurances from the government that at the end of this 10-year lease term that they would either have the chance to renew or they'd have a chance to sell their improvements to a third party. And that's what they thought they got in the revisions to the lease, which you see. Thank you, Mr. Gregor. Thank you. The case is submitted, and that concludes.